

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**RECEIVED**

SEP - 4 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

SECURITIES AND EXCHANGE
COMMISSION,

  CASE NO.:

  Plaintiff,

v.

**1 GLOBAL CAPITAL LLC, and**
**CARL RUDERMAN,**

  **Defendants, and**

**1 WEST CAPITAL LLC,**
**BRIGHT SMILE FINANCING, LLC,**
**BRR BLOCK INC.,**
**DIGI SOUTH, LLC,**
**GANADOR ENTERPRISES, LLC,**
**MEDIA PAY LLC,**
**PAY NOW DIRECT LLC, and**
**RUDERMAN FAMILY TRUST,**

  Relief Defendants.

_____/

1:18-cv-06029
Judge Charles R. Norgle, Sr.
Magistrate Judge Jeffrey Cole

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

SECURITIES AND EXCHANGE
COMMISSION,

  Plaintiff,

v.

**1 GLOBAL CAPITAL LLC, and**
**CARL RUDERMAN,**

  **Defendants, and**

**1 WEST CAPITAL LLC,**
**BRIGHT SMILE FINANCING, LLC,**
**BRR BLOCK INC.,**

  **CASE NO. 0:18-CV-61991-BB**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:18-cv-61991-BB

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

1 GLOBAL CAPITAL LLC, and
CARL RUDERMAN,

Defendants, and

1 WEST CAPITAL LLC,
BRIGHT SMILE FINANCING, LLC,
BRR BLOCK INC.,
DIGI SOUTH, LLC,
GANADOR ENTERPRISES, LLC,
MEDIA PAY LLC,
PAY NOW DIRECT LLC, and
RUDERMAN FAMILY TRUST,

Relief Defendants.

_____/

## SEALED ORDER GRANTING PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY *EX PARTE* MOTION FOR APPOINTMENT OF RECEIVER

**WHEREAS** Plaintiff Securities and Exchange Commission has filed a motion for the appointment of a Receiver over Relief Defendants Bright Smile Financing, LLC, BRR Block Inc., Digi South, LLC, Ganador Enterprises, LLC, Media Pay LLC, and Pay Now Direct LLC, (collectively, "Relief Defendants") with full and exclusive power, duty and authority to: administer and manage the business affairs, funds, assets, causes in action and any other property of these Relief Defendants; marshal and safeguard all of their assets; and take whatever actions are necessary for the protection of the investors ("Motion for Appointment of Receiver");

1

CASE NO. 0:18-cv-61991-BB

WHEREAS, the Commission has made a sufficient and proper showing in support of the relief requested;

WHEREAS, the Commission has submitted the credentials of a candidate to be appointed as Receiver of all of the assets, properties, books and records, and other items of these Relief Defendants, including any properties, assets and other items held in their names or their principals' names, and the Commission has advised the Court that this candidate is prepared to assume this responsibility if so ordered by the Court;

The Motion for Appointment of Receiver, **ECF No. [6], is GRANTED IN PART, and DENIED IN PART**, and it is **ORDERED AND ADJUDGED** as follows: **Jon A. Sale, Nelson Mullins Broad and Cassel, 2 South Biscayne Boulevard, One Biscayne Tower, 21st Floor, Miami, Florida 33131, 305-373-9400, jon.sale@nelsonmullins.com** is appointed the Receiver over these Relief Defendants, their subsidiaries, successors and assigns, and is hereby authorized, empowered, and directed to:

1.     Take immediate possession of all property, assets and estates of every kind of these Relief Defendants, whatsoever and where ever located belonging to or in the possession of these Relief Defendants, including but not limited to all offices maintained by these Relief Defendants, rights of action, books, papers, data processing records, evidences of debt, bank accounts, savings accounts, certificates of deposit, stocks, bonds, debentures and other securities, mortgages, furniture, fixtures, office supplies and equipment, and all real property of these Relief Defendants wherever situated, and to administer such assets as is required in order to comply with the directions contained in this Order, and to hold all other assets pending further order of this Court;

2

2.      Investigate the manner in which the affairs of these Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of these Relief Defendants and their investors and other creditors, as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred money or other proceeds directly or indirectly traceable from investors in Defendant 1 Global Capital LLC, and Relief Defendant 1 West Capital LLC, and these Relief Defendants, their officers, directors, employees, affiliates, subsidiaries, or any persons acting in concert or participation with them, or against any transfers of money or other proceeds directly or indirectly traceable from investors in 1 Global, 1 West, and these Relief Defendants; provided such actions may include, but not be limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, et. seq. or otherwise, rescission and restitution, the collection of debts, and such orders from this Court as may be necessary to enforce this Order;

3.      Present to this Court periodic reports (no less than quarterly) reflecting the existence and value of the assets of these Relief Defendants and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of these Relief Defendants;

4.      Appoint one or more special agents, employ legal counsel, actuaries, accountants, clerks, consultants and assistants as the Receiver deems necessary and to fix and pay their reasonable compensation and reasonable expenses, as well as all reasonable expenses of taking possession of the assets and business of these Relief Defendants, and exercising the power

granted by this Order, subject to approval by this Court. This includes a management or restructuring company or companies;

      5.      Engage persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities, including, but not limited to, the United States Marshal's Service or a private security firm;

      6.      Defend, compromise or settle legal actions, including the instant proceeding, in which these Relief Defendants or the Receiver are a party, commenced either prior to or subsequent to this Order. The Receiver may also waive any attorney-client or other privilege held by these Relief Defendants;

      7.      Assume control of, and be named as authorized signatory for, all accounts at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds, wherever situated, of these Relief Defendants and, upon order of this Court, of any of their subsidiaries or affiliates, provided that the Receiver deems it necessary;

      8.      Make or authorize such payments and disbursements from the funds and assets taken into control, or thereafter received by the Receiver, and incur, or authorize the incurrence of, such expenses and make, or authorize the making of, such agreements as may be reasonable, necessary, and advisable in discharging the Receiver's duties;

      9.      Have access to and review all mail of these Relief Defendants (except for mail that appears on its face to be purely personal or attorney-client privileged) received at any office or address of these Relief Defendants. All mail that is opened by the Receiver and, upon inspection, is determined by the Receiver to be personal or attorney-client privileged, shall be promptly delivered to the addressee and the Receiver shall not retain any copy.

**IT IS FURTHER ORDERED AND ADJUDGED** that, in connection with the appointment of the Receiver provided for above:

10.     These Relief Defendants and all of their directors, officers, agents, employees, attorneys, attorneys-in-fact, shareholders, and other persons who are in custody, possession, or control of any assets, books, records, or other property of these Relief Defendants shall deliver forthwith upon demand such property, monies, books and records to the Receiver, and shall forthwith grant to the Receiver authorization to be a signatory as to all accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets or funds in the name of or for the benefit of these Relief Defendants;

11.     All banks, brokerage firms, financial institutions, and other business entities which have possession, custody or control of any assets, funds or accounts in the name of, or for the benefit of, these Relief Defendants shall cooperate expeditiously in the granting of control and authorization as a necessary signatory as to said assets and accounts to the Receiver;

12.     Unless authorized by the Receiver, these Relief Defendants and their principals shall take no action, nor purport to take any action, in the name of or on behalf of these Relief Defendants;

13.     The Receiver further is authorized to take depositions, subpoena records, and other discovery.  The Relief Defendants and their principals, and respective officers, agents, employees, attorneys, and attorneys-in-fact shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver in the conduct of the Receiver's duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, premises, and choses in action described above;

14. The Receiver, and any counsel whom the Receiver may select, are entitled to reasonable compensation from the assets now held by or in the possession or control of or which may be received by these Relief Defendants; said amount or amounts of compensation shall be commensurate with their duties and obligations under the circumstances, subject to approval of the Court. The Receiver and his counsel shall file with the Court no less than quarterly an application for reasonable compensation and provide to the Commission and the Court a copy of the Commission's Standard Fund Accounting Report;

15. During the period of this receivership, all persons, including creditors, banks, investors, or others, with actual notice of this Order, other than the Receiver, are enjoined from filing a petition for relief under the United States Bankruptcy Code without prior permission from this Court, or from in any way disturbing the assets or proceeds of the receivership or from prosecuting any actions or proceedings which involve the Receiver or which affect the property of these Relief Defendants;

16. The Receiver is fully authorized to proceed with any filing the Receiver may deem appropriate under the Bankruptcy Code as to these Relief Defendants;

17. Title to all property, real or personal, all contracts, rights of action and all books and records of these Relief Defendants and their principals, wherever located within or without this state, is vested by operation of law in the Receiver;

18. Upon request by the Receiver, any company providing telephone services to these Relief Defendants shall provide a reference of calls from any number presently assigned to these Relief Defendants to any such number designated by the Receiver or perform any other changes necessary to the conduct of the receivership;

19.     Any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to these Relief Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver;

20.     The United States Postal Service is directed to provide any information requested by the Receiver regarding these Relief Defendants, and to handle future deliveries of the mail of these Relief Defendants as directed by the Receiver;

21.     No bank, savings and loan association, other financial institution, or any other person or entity shall exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets of these Relief Defendants to the Receiver's control without the permission of this Court;

22.     No bond shall be required in connection with the appointment of the Receiver. Except for an act of gross negligence or greater, the Receiver shall not be liable for any loss or damage incurred by these Relief Defendants or by the Receiver's officers, agents or employees, or any other person, by reason of any act performed or omitted to be performed by the Receiver in connection with the discharge of the Receiver's duties and responsibilities;

23.     Service of this Order shall be sufficient if made upon these Relief Defendants and their principals by personal service, facsimile or overnight courier;

24.     In the event that the Receiver discovers that investor funds received by these Relief Defendants have been transferred to other persons or entities, the Receiver shall apply to this Court for an Order giving the Receiver possession of such funds and, if the Receiver deems it advisable, extending this receivership over any person or entity holding such investor funds; and

25.     This Court shall retain jurisdiction of this matter for all purposes.

CASE NO. 0:18-cv-61991-BB

**DONE AND ORDERED** in chambers in Miami, Florida this 23rd day of August, 2018.

_____

BETH BLOOM
UNITED STATES DISTRICT JUDGE

Copies to:

Robert Levenson, Esq.
Senior Trial Counsel
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Phone: (305) 982-6341
Fax: (305) 536-4154
Levensonr@sec.gov
_Counsel for Securities and Exchange Commission_

Christopher E. Martin, Esq.
Senior Trial Counsel
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Phone: (305) 982-6386
Fax: (305) 536-4154
martinc@sec.gov
_Counsel for Securities and Exchange Commission_

Jon A. Sale, Esq.
Nelson Mullins Broad and Cassel
2 South Biscayne Boulevard
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Jon.sale@nelsonmullins.com
_Receiver_

8

**DIGI SOUTH, LLC,**
**GANADOR ENTERPRISES, LLC,**
**MEDIA PAY LLC,**
**PAY NOW DIRECT LLC, and**
**RUDERMAN FAMILY TRUST,**

       Relief Defendants.

_____/

## RECEIVER'S NOTICE OF FILING
## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF and
## <u>ORDER GRANTING MOTION FOR APPOINTMENT OF RECEIVER</u>

PLEASE TAKE NOTICE that the Court-Appointed Receiver, Jon A. Sale, not individually, but solely in his capacity as Receiver for Bright Smile Financing, LLC; BRR Block Inc.; Digi South LLC; Ganador Enterprises, LLC; Media Pay LLC; and Pay Now Direct LLC, hereby gives notice of filing the Plaintiff Securities and Exchange Commission's Complaint for Injunctive and Other Relief, and Order Granting Emergency *Ex Parte* Motion for Appointment of Receiver.

Respectfully submitted this 1st day of September, 2018.

                        Respectfully submitted,

                        NELSON MULLINS BROAD AND CASSEL
                        Attorneys for Receiver
                        One Biscayne Tower, 21st Floor
                        2 S. Biscayne Boulevard
                        Miami, FL 33131
                        Telephone: 305.373.9400
                        Facsimile: 305.995.6449

By: _____
                        Daniel S. Newman
                        Florida Bar No. 0962767
                        Gary M. Freedman
                        Florida Bar No. 727260
                        Jonathan Etra
                        Florida Bar No. 0686905
                        Michael Lessne
                        Florida Bar No. 73881

FILED BY _____ D.C.

AUG 2 3 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

1 GLOBAL CAPITAL LLC, and
CARL RUDERMAN,

      Defendants, and

## UNDER SEAL

1 WEST CAPITAL LLC,
BRIGHT SMILE FINANCING, LLC,
BRR BLOCK INC.,
DIGI SOUTH LLC,
GANADOR ENTERPRISES, LLC,
MEDIA PAY LLC,
PAY NOW DIRECT LLC, and
RUDERMAN FAMILY TRUST,

      Relief Defendants.

_____/

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges as follows:

### I. INTRODUCTION

1. The Commission brings this action as the result of a four-year-long unregistered securities offering fraud conducted by Defendant 1 Global Capital LLC, and overseen by Defendant Carl Ruderman, that victimized thousands of investors nationwide, many of whom used their retirement savings to invest. From no later than February 2014 until July 27, 2018, 1 Global (also referred to as "the Company"), a private, South Florida firm, fraudulently raised more than $287 million from more than 3,400 investors to fund its business of offering short-term financing to small and medium-sized businesses.

2.       1 Global used a network of barred brokers, registered and unregistered investment advisers, and other sales agents – to whom they paid millions in commissions – to offer and sell unregistered securities to investors in no fewer than 25 states. The Company, through its marketing materials distributed to sales agents and the sales agents themselves, promised investors a high-return, low-risk investment in which 1 Global would use investor money to make short-term cash advances called Merchant Cash Advances ("MCAs") to businesses that could not obtain more traditional financing such as bank loans. The Company touted a rigorous underwriting process through which it purportedly approved only one in ten merchants who applied for a loan, and an electronic collection process that would allow investors to make a profit.

3.       In reality, the Company used substantial investor funds for purposes other than the cash advances, including paying operating expenses and purchasing already-distressed, long-term credit card debt. In addition, 1 Global and Ruderman misappropriated at least $35 million of investor money, at least $28 million of which was paid: (1) directly to Ruderman, Relief Defendant Ruderman Family Trust, and other entities he owned or controlled; (2) to companies owned or operated by Ruderman's relatives and acquaintances that had nothing to do with 1 Global's cash advance business; and (3) to fund Ruderman's lavish expenses such as a luxury vacation to Greece and monthly payments for his Mercedes Benz.

4.       1 Global and its sales representatives also made numerous other material misrepresentations and omissions to investors, including: (1) deceptively claiming the Company would only use investor money to fund MCAs; (2) falsely representing the amount of investor money the Company would take for its own use; (3) sending monthly account statements to investors that falsely represented their portfolio balances, rates of return, and the amount of their

2

cash 1 Global had in the bank to fund merchant loans; and (4) falsely representing the Company had an independent auditor that had endorsed certain aspects of the Company's business model.

5.      Largely as a result of 1 Global and Ruderman's misappropriation and improper use of investor funds, by no later than October 2017 1 Global experienced a shortage of investor funds approximating $23 million that should have been in the Company's bank accounts and available for merchant loans. This shortfall continued and increased with time, so that by June 30, 2018, 1 Global's financial records showed approximately $50 million in missing investor funds.

6.      Less than a month later, 1 Global and a sister company, Relief Defendant 1 West Capital LLC (which 1 Global used to make merchant loans in California), filed for Chapter 11 bankruptcy protection, placing investors at risk of losing significant funds. An independent management team is now operating 1 Global and 1 West.

7.      Ruderman founded 1 Global, was its chairman, and functioned for the entirety of its operations as its Chief Executive Officer. He maintained sole operational control over the Company, closely monitored its fundraising from investors and the merchant loan process, and made all key management decisions. Although Ruderman is no longer associated with 1 Global, he continues to control or have access to entities that received misappropriated investor funds from 1 Global.

8.      Through their conduct, 1 Global and Ruderman violated Sections 5(a) and (c) and Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and (c) and 77q(a), and Sections 10(b) and 15(a)(1) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and 78o(a)(1) and 17 C.F.R. §240.10b-5. Additionally, Ruderman aided and abetted 1 Global's violations of Section 10(b) and Rule 10b-5 of the

Exchange Act.  As 1 Global's control person, due to 1 Global violations of Section 10(b) and Rule 10b-5 of the Exchange Act, Ruderman also violated Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  The Commission seeks injunctive relief, disgorgement and prejudgment interest, and civil penalties against both Defendants, and disgorgement and prejudgment interest against the Relief Defendants.  Simultaneously with filing this Complaint, the Commission also seeks emergency relief, including the appointment of a Receiver over certain Relief Defendants and an asset freeze against Ruderman and certain Relief Defendants.

## II.  DEFENDANTS AND RELIEF DEFENDANTS

### A.  Defendants

9.      **1 Global** is a Florida limited liability company headquartered in Hallandale Beach and formed in 2013.  Corporate records show the Company is owned entirely by the Ruderman Family Trust.  Until July 27, 2018, Ruderman was its Chairman and CEO.  The Company had about 100 employees at the time it filed for bankruptcy.  The Company never registered any of its securities with the Commission and did not have any publicly traded stock.

10.      **Ruderman**, 77, is a resident of Aventura, Florida, and the sole owner of 1 Global through the Ruderman Family Trust.  Until July 27, 2018, when he resigned from 1 Global, he was 1 Global's Chairman and CEO.  He controlled all aspects of the Company's operations until he resigned.  Ruderman continues to have ownership interests in Relief Defendants Bright Smile Financing, LLC, and Ganador Enterprises, LLC through Trusts that he controls.  As part of the Commission's investigation into this matter, the staff subpoenaed Ruderman for sworn testimony, but he refused to appear.

### B.  Relief Defendants

11.      **1 West** is a Florida limited liability company formed in April 2014 and

headquartered at 1 Global's Hallandale Beach address.  It is also owned by the Ruderman Family Trust.  Corporate records list 1 Global's former operations manager as its manager.  1 West operated as 1 Global's agent in California to solicit and enter into contracts with merchants, and received approximately $50 million in investor funds from 1 Global.  1 West also filed for Chapter 11 bankruptcy protection on July 27, 2018, and is now under the control of the same independent management as 1 Global.

12.     **Bright Smile Financing** is a Florida limited liability company formed in March 2017.  Bright Smile Financing loans individuals money to finance cosmetic or dental procedures. Corporate records show Bright Smile Financing used the same address as 1 Global and is 100% owned by Ruderman through the Bright Smile Trust, that Ruderman controls.  Up until a few days ago, Bright Smile Financing used 1 Global's former operations manager as its manager. From May 16, 2017 through June 2018, Bright Smile Financing received approximately $15.3 million in investor funds from 1 Global at Ruderman's direction for no consideration or legitimate services.

13.     **Ganador Enterprises** is a Florida limited liability company formed on March 3, 2016.  Corporate records show the Ruderman Family Trust owns 50% of Ganador, with two other individuals who are unrelated to 1 Global owning the other 50%.  Ganador lists 1 Global's former chief operating officer and Ruderman's brother-in-law as its manager.  Ganador makes individual consumer loans, including payday loans.  Ganador uses the same address as 1 Global. From April 28, 2016 through June 2018, Ganador received approximately $5.6 million in investor funds from 1 Global at Ruderman's direction for no consideration or legitimate services.

14.     **BRR Block Inc.** is a Florida corporation based in Boca Raton and incorporated in January 2018.  Corporate records show one of Ruderman's sons is BRR Block's sole officer and

director.  Its business is purportedly related to blockchain technology.  In January 16 2018, BRR Block received at least $1 million in investor funds from 1 Global for no consideration or legitimate services.

15.    **Digi South, LLC** is a Florida limited liability company formed in November 2012.  Digi South is owned by the Ruderman Family Trust and uses the same address as 1 Global.  Corporate records show that until 2017, its manager was Ruderman's sister-in-law.  Since 2017, the company has listed 1 Global's former operations manager as its manager.  Among other things, Digi South used to own Playgirl and other adult magazines.  Through April 2018, Digi South received approximately $805,000 in investor funds from 1 Global for no consideration or legitimate services.

16.    **Media Pay LLC** is a Florida limited liability company based in North Miami, Florida and formed in January 2015 and administratively dissolved in September 2016.  Corporate records show its manager is Ruderman's sister-in-law.  Through April 2018, Media Pay received approximately $647,000 in investor funds from 1 Global for no consideration or legitimate services.

17.    **Pay Now Direct LLC** is a Florida limited liability company formed in April 2015 that was administratively dissolved in September 2017.  The entity listed 1 Global's former operations manager as its manager.  Pay Now Direct is an entity Ruderman uses to pay his expenses, and it uses the same address as 1 Global.  Through June 2018, Pay Now Direct received approximately $5.3 million in investor funds from 1 Global and the Ruderman Family Trust for no consideration or legitimate services.

18.    The **Ruderman Family Trust** is a Florida trust instrument dated June 2, 2014, created to administer certain Ruderman assets.  Ruderman is the grantor, his brother-in-law is the

6

trustee, and Ruderman's wife and children are the beneficiaries. Through April 2018, the Trust received approximately $4 million in investor funds from 1 Global for no consideration or legitimate services.

### III. JURISDICTION AND VENUE

19.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§78u(d), 78u(e), and 78aa.

20.     This Court has personal jurisdiction over the Defendants and Relief Defendants and venue is proper in the Southern District of Florida as Ruderman resides in the District and 1 Global and all of the Relief Defendants used addresses in this District and conducted their business in this District. In particular, 1 Global's operations were located in the Southern District, and Ruderman and other Company officers conducted, supervised, and managed all aspects of 1 Global's fundraising and MCA business at 1 Global's Hallandale Beach headquarters.

21.     The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

### IV. 1 GLOBAL'S MERCHANT CASH ADVANCE BUSINESS

22.     Ruderman founded 1 Global in 2013, purportedly seeking "a better growth opportunity for his family's funds." By 2018, the Company had grown to more than 100 employees in sales, underwriting, collections, finance, technology and lawyers.

23.     Ruderman was a hands-on Chairman and CEO, personally overseeing all aspects of the Company's operations. There was no board of directors or any other high-level executive

with decision-making authority. Ruderman knew at all times how much 1 Global had raised from investors and received a daily report showing how many cash advance transactions the Company had funded. Ruderman signed 1 Global's agreements with third-party sales agents to allow them to offer and sell 1 Global's unregistered securities. He thus was responsible for the terms of those agreements, which specified the sales agents' compensation and required 1 Global to approve all marketing materials and sales brochures the agents used.

24.     Ruderman also personally directed or approved all of the Company's major transactions, including an approximate $40 million loan to a California automotive firm and the $50 million purchase of distressed credit card debt, the latter of which was not an allowed use of investor funds. He carefully monitored account statements the Company sent to investors each month, approved sending them, and knew they contained false statements about the value of investors' portfolios and rates of return. He directed bad debt reserve amounts, ordered investor funds sent to himself and companies his family owned, and told one employee who questioned those transactions it was his company and he could do what he wanted with investor money.

25.     In fact, Ruderman was so involved in the Company that he bragged in an email to an executive of a hedge fund that gave 1 Global a line of credit in 2016 "I'm personally on top of all operations from 8am thru 6:30pm everyday!"

26.     Until it ceased operations on July 27, 2018, 1 Global was in the business of funding MCAs - short-term loans to small and medium-sized businesses. According to its marketing materials and website, 1 Global provided these businesses with an alternative source of funding to traditional bank loans and other financing methods, which it touted as insufficient to meet the short-term needs of smaller businesses.

27.     1 Global contracted with 100 to 200 third-party vendors to find merchants

8

interested in applying for cash advances. 1 Global paid those companies a finder's fee for each merchant who received a cash advance. The amount of each finder's fee varied, depending on the loan amount, the third party's track record with 1 Global, and other factors. 1 Global determined the amount of the finder's fee in each instance. Through April 2018, 1 Global paid third parties who solicited merchants approximately $15 million in finder's fees for their efforts.

28.     Once a finder located an interested merchant, the merchant would apply directly to 1 Global for a cash advance. In marketing materials 1 Global sent to sales agents to use in soliciting investors, 1 Global touted a comprehensive underwriting process and stressed that it only approved loans to one out of every ten merchants who applied.

29.     The Company indicated in its marketing materials that it used a variety of methods to weed out risky loan candidates, including internet research, credit checks, specific programs for background checks and business analysis, a review of bank records and other documents, and, most importantly, personal contact with every merchant before the Company made an advance.

30.     The Company's materials also reported that 1 Global's MCAs were typically small, averaging $68,000. The typical repayment term was anywhere from four months to one year. The MCAs were purportedly made against a business' future cash receivables, and merchants agreed to make daily payments via electronic (ACH) debiting from their business operating bank accounts as they received payments from their customers or vendors.

31.     1 Global's materials also touted a consistently low default rate, specifically stating that its average annual loan write-off rate was only 4%. In addition, the Company told investors and others that approximately 30% of the merchants it loaned money to refinanced their loans.

32.     In reality, the Company's MCA process was not nearly so rigorous and its cash

advance business functioned much differently. In contrast to its claim that its average loan amount was $68,000, 1 Global often made loans of hundreds of thousands or even millions of dollars. In one instance, 1 Global made an MCA of approximately $40 million to a single California automobile dealership – a transaction Ruderman personally directed.

33. The Company also had far more difficulty collecting from merchants than it publicly disclosed. For example, in 2016, 210 of the approximately 1,166 MCAs 1 Global funded, a total of 18%, were the subject of collection lawsuits. In 2017, 328 of 1 Global's 2,092 MCAs, a total of 15%, were the subject of collection lawsuits.

34. Additionally, the Company's website told a far different story than the thorough underwriting process 1 Global touted to investors and elsewhere. The website stressed how simple and quick it was for merchants to obtain loans, noting that the MCAs were *unsecured* business cash advances. The website consistently promised merchants they could execute an MCA and "have your money in as little as 24 hours."

35. The website also promised merchants that "If you own a business and need cash fast, we're the company to call," going on to promise "We can provide the money you need without the hassles and hoops other financial institutions put you through . . . You do not have to come to us hat in hand with scads of paperwork proving your credit worthiness only to have your application denied. *We fund 90% of the businesses that apply without basing it on their credit scores* . . . We have the resources and the commitment to get you that unsecured advancement you need immediately." Emphasis added.

36. Through April 2018, 1 Global and 1 West made about $348 million in merchant cash advances involving approximately 4,000 MCAs. As of that same date, merchants had repaid approximately $241 million of that amount. As of April 2018, due to collectability issues

and the Defendants' misappropriation of investor funds, 1 Global owes investors at least $272 million but only had $27.5 million in its bank accounts. 1 Global does not currently have enough funds to repay investors and filed for bankruptcy in July 2018.

## V. 1 GLOBAL'S SOLICITATION OF INVESTOR FUNDS

### A. The Network Of Sales Agents

37.     1 Global funded its MCA business and its operations almost entirely with money from investors, whom the Company referred to alternately as "Lenders" or "Syndicate Partners." The only non-investor source of funds for 1 Global came from a $10 million line of credit the Company obtained from a hedge fund in 2016, from which it drew down $9.5 million over several months in 2016 and 2017 to make MCAs at the direction of the hedge fund. The remainder of 1 Global's MCA business derived entirely from investors' contributions.

38.     1 Global found its investors through a second network of sales agents consisting in large part of registered and unregistered investment advisers and former (and in some cases barred) brokers. The Company had dozens of sales agents, to whom it paid commissions usually ranging from .75% to 3% of the amount of investor funds they brought to 1 Global.

39.     For example, many sales agents received 3% of every new investment amount they brought in to the Company. If the investment rolled over into another term, most sales agents received an additional .75%. In addition, some sales agents who brought other sales agents into the Company received an additional .75% of every amount their recruited sales agents sold. Through April 2018, 1 Global paid sales agents nearly $9 million in commissions for getting investors to put money into 1 Global.

40.     Sales agents signed an Affiliate Agreement with 1 Global outlining their rights and responsibilities in, and compensation for, selling the 1 Global investment. Ruderman signed at least two of these Affiliate Agreements on behalf of the Company, allowing sales agents to

market the 1 Global investment.  The Agreements specified that 1 Global had to provide or approve all marketing materials the sales agents provided to prospective investors.  In the Agreements and in meetings and telephone calls, 1 Global stressed that its minimum investment amount was $25,000, and that the investment opportunity was for a limited number of sophisticated investors.

41.     In practice, however, 1 Global placed no restrictions on who sales agents could solicit to invest in the Company, and frequently waived the $25,000 minimum investment requirement.  Sales agents regularly solicited large numbers of their existing clients to invest.  In short, the Company accepted money from any and all investors the sales agents could find.  As 1 Global's owner, Chairman, and CEO, Ruderman substantially participated in the offer and sale of 1 Global's unregistered securities to the investing public and paying transaction-based compensation to the sales agents by: (1) hiring sales agents; (2) attending due diligence meetings with sales agents; (3) executing at least two Affiliate Agreements; and (4) directing 1 Global to pay the sales agents' commissions.

42.     From February 2014 through April 2018, 1 Global received at least $287 million from 3,400 investors located in at least 25 states, with at least 100 investors each located in California, Florida, Illinois, Ohio, and Tennessee.  More than one-third of the money came from those who invested through IRAs.  In the months after April 2018, 1 Global continued to receive millions of dollars from investors.  The funds 1 Global raised were commingled or pooled together into one or more of 1 Global's bank accounts.

### B.  1 Global's Sales And Marketing Efforts

43.     1 Global regularly provided sales materials to its agents for use in marketing the investment.  Those materials included a list of Frequently Asked Questions, a history of the

Company, and a description of both the MCA program and the investment process. Sales agents used the materials in soliciting clients to invest, attaching them to emails in at least one case and other times using the information in them when they spoke to prospective investors.

44.     The marketing materials contained the statements about the purportedly rigorous MCA loan approval and repayment process described earlier in this Complaint. In addition, the marketing materials consistently touted 1 Global's alleged consistently high returns for investors. The Frequently Asked Questions claimed 1 Global investors had *averaged* "high single digit" and "low double digit" annual returns.

45.     In addition, 1 Global sent copies of actual monthly investor account statements to sales agents to show investors. Those account statements showed returns ranging from 8% to 17% a year. Starting in January 2018, 1 Global changed its marketing materials to tell investors that they would earn a guaranteed minimum of 3% a year, with the possibility of much higher returns.

46.     The marketing materials, including the Frequently Asked Questions, also stated that 1 Global collected an average of $1.30 to $1.35 or $1.40 on each dollar it advanced in an MCA. This was the means by which 1 Global and investors both purportedly made a profit.

47.     Using this information, sales agents usually told investors 1 Global could earn them high single digit to low double digit returns a year, and at least one sales agent created his own promotional flyer based on the Company's information emphasizing these returns. Both the Company and sales agents stressed that 1 Global offered better returns than fixed instruments such as annuities, and was a safe, short-term alternative to more risky stock market investments.

48.     Both sales agents and investors were attracted by these allegedly high profits, with many investors deciding to send money on the basis of them. For example, based on the

Case 0:18-cv-61991-BB *SEALED*   Document 1   Entered on FLSD Docket 08/23/2018   Page 14 of 34

promised high returns, one investor gave almost $1 million from a 401K retirement plan to 1 Global for MCAs. Another investor invested $135,000 after his sales agent showed him one of the sample client statements that reflected double digit annual returns. That same investor sent in another approximately $150,000 in the ensuing months based on receiving his own monthly account statements showing annual returns of at least 8%. Still another investor contributed approximately 20% of her net worth in two investments in September 2017 and May 2018 based on the promised high rates of return and the profits being shown on her monthly account statements.

49.     Although 1 Global told sales agents and investors that it was not selling securities because the notes it gave to investors were allegedly only for nine months, at least one early version of the Company's marketing materials called the opportunity to put money into 1 Global an investment. The cover read "Putting cash to work for merchants while earning high returns on your investment." Many investors wrote the word "investment" in the memo line of their checks, and 1 Global's marketing materials touted the Company as an investment alternative to annuities and stocks. At least one sales agent repeatedly told clients in emails that he was offering them an investment in 1 Global.

### C.  The Memorandum Of Indebtedness

50.     For the vast majority of the four-plus years 1 Global offered and sold its investment, it used an instrument entitled a Memorandum of Indebtedness ("MOI") as the note or contract between the Company and investors.

51.     The MOI termed the investor a "Lender," and identified the Company as the "Borrower." The MOI specifically stated that an investor was providing money to 1 Global so the Company could expand its business activities, which it termed the "Covered Activities." The

only specific Covered Activity identified in the MOI was the MCAs. And the only use of investor money the Company identified in its marketing materials was the MCAs. After 1 Global received investor funds, it pooled and commingled them together in non-segregated 1 Global bank accounts.

52.      While the MOI stated that it was a nine-month note, for most of the time 1 Global raised money from investors, the MOI also stated the note would automatically roll over into a new nine-month term unless the investor expressly informed the Company in writing at least 30 days before the end of the nine months that he or she did not want the note to roll over.

53.      For a brief period in early 2018, 1 Global changed the MOI to provide that the note would mature after nine months unless an investor specifically informed the Company that he or she wanted to renew the investment. However, 1 Global reinstated the automatic rollover provision about two months later as a result of the "paperwork nightmare" the revised opt-in procedure was causing.

54.      In fact, the overwhelming majority of investors allowed their investments to automatically roll over. One sales agent estimated only six to eight of the hundreds of investors he solicited redeemed their investments after nine months. Company bank records show that as of April 30, 2018, investors had sent more than $287 million to 1 Global, but 1 Global had returned only about $16 million of those funds through redemptions or other payments.

55.      Even if an investor redeemed his or her investment after nine months, the note extended beyond nine months because it took 1 Global several months to fully pay out an investor's principal and interest. 1 Global called this period "the unwinding" and "the grace period" in the MOIs.

56.      The unwinding period was caused by the way 1 Global used investor money to

fund MCAs. Rather than use investor funds on a single MCA or a small number of MCAs, the Company gave each investor a small, fractionalized interest in up to hundreds of MCAs. A Company computer system would assign the investor's funds automatically, based on the amount of MCAs that came in daily in the weeks following an investment. Under this system, one MCA would be funded with dozens or even hundreds of investors' funds pooled together.

57. Using this process often resulted in the Company taking months to place all of an investor's funds into MCAs. Thus, if an investor elected to redeem his or her investment after nine months, it could take months after that for the merchants who received the investor's money to fully repay the MCAs. Often the Company would not generate enough money from the MCAs to fully pay redeeming investors, forcing the Company to use new investor funds to pay off redeeming investors.

58. 1 Global did not pay investors the interest or the increase in valuation of their portfolio the Company told them they were earning until the investor cashed out some or all of their investment. Although 1 Global sent investors monthly account statements purporting to show each investor's account credited with the interest the investor had earned on MCA repayments, investors did not receive those payments right away. Rather, 1 Global simply commingled all those investor funds into its various bank accounts and frequently reinvested the investor money into new MCAs. This also allowed 1 Global to misappropriate investor funds.

59. 1 Global eventually memorialized the unwinding period into specific timetables at the beginning of 2018. It informed investors through marketing materials sent to sales agents that if an investor who redeemed had placed less than $250,000 with 1 Global, he or she would be fully repaid in 12 months, three months after the end of the nine-month term. For investments of greater than $250,000, the repayment would take six additional months, making the MOI a 15-

month note.

60. Another key provision of the MOI provided that it was within 1 Global's sole discretion how to use investor money to make MCA loans. In fact, investors had no say in how 1 Global used their money. Investors could not and did not manage their MCA loan portfolios; it was solely up to 1 Global whether and when to use an investor's money to fund MCAs and which MCAs to fund. The success of the investment and whether an investor earned profits was solely dependent on 1 Global's decisions on MCA funding and other uses of funds, as well as repayment and collection efforts.

61. The MOI contained a paragraph stating the investor was sophisticated and was "qualified," meaning he or she had a certain income level or net worth. However, 1 Global never enforced this provision, did not restrict who sales agents could offer the investments to, and accepted investments from anyone who wanted to invest, regardless of their net worth, income, or sophistication.

62. Finally, the MOI disclosed 1 Global would charge investors in two ways. The first was a 13% management fee that 1 Global would take from the amount collected from MCA repayments. The second way 1 Global said it would charge investors was to have them reimburse the Company the finders' fees it paid to third parties for finding merchants to take MCAs. The MOI contained only those two ways 1 Global could charge investors. However, in truth 1 Global took far greater amounts from investor funds to pay its operating expenses, and for its misappropriation to Ruderman and his related businesses.

## VI. MISREPRESENTATIONS AND OMISSIONS TO INVESTORS

### A. False Claims About Use Of Investor Funds

63. 1 Global falsely represented to investors on its website, in its marketing materials,

17

and in the MOIs that it would use their money to fund MCAs. 1 Global representatives also made these same false statements to sales agents in meetings to pitch the MOI investment.

64.     In reality, 1 Global used a substantial amount of investors' funds for purposes other than making MCAs. First, 1 Global used significant investor funds on the Company's operations. 1 Global spent approximately $53 million in operating expenses through April 2018. Because investor funds were the sole source of 1 Global's money, the Company necessarily had to use investor funds to pay operating expenses.

65.     However, the total investor funds available to 1 Global to use for operating expenses from the two ways it could collect money from investors, as described more fully below, was only about $46.6 million. Thus, 1 Global spent about $6.4 million more in investor funds on operating expenses than it told investors it would.

66.     Ruderman also authorized 1 Global to spend another $50 million of investor money to purchase $60 million of bad credit card debt from an entity called Travis Portfolio. 1 Global began making the payments for this purchase on September 28, 2017. The $50 million represented about 16% of all investor funds 1 Global raised through April 2018.

67.     Buying the credit card debt was not an MCA, and thus not an allowed use of investor funds. Travis Portfolio was not using the money to fund specific business operations as 1 Global's marketing materials and website indicated MCAs were for. Furthermore, because the credit card debt was already considered bad debt, this was a very risky investment and the repayment time was far longer than the 4-to-12 months for MCAs that 1 Global advertised. In fact, Travis Portfolio collected the credit card debt so slowly that it could have taken that entity *four years* to repay 1 Global the entire amount. This slow repayment impacted investors' ability to make a profit and 1 Global's ability to fund its MCA business and repay investors.

68.     Last, 1 Global, authorized and directed by Ruderman, misappropriated at least $28 million in investor funds to pay Ruderman personally as well as several companies in which he or his family members had a direct interest.  This included, as described more fully below, money to help fund a family vacation to Greece, monthly payments for a Mercedes Benz Ruderman leased, his monthly American Express credit card bill, payments for Ruderman's chef and housekeeper, and $4 million to his family trust.

69.     It also included more than $20 million payments over several years to Bright Smile Financing and Ganador, companies that funded consumer and individual loans that had nothing to do with MCAs, and which Ruderman either owned outright or partially owned through Trusts he controlled.  The first payment by 1 Global to Bright Smile Financing occurred on May 6, 2017, while 1 Global made its first payment to Ganador on April 28, 2016.

70.     The misappropriation also included a $1 million payment on January 16, 2018 from 1 Global to BRR Block, a company owned by one of Ruderman's sons that also had nothing to do with MCAs.  None of the payments was disclosed in 1 Global's marketing materials or the MOIs, and these payments led directly to the shortage of investor funds.

71.     Investors said they would not have invested in 1 Global's MCA program, and sales agents said they would not have solicited investors, if they had known 1 Global was misrepresenting how it used investor funds.

**B.  False Claims About Fees And Expenses 1 Global Could Take From Investors**

72.     As previously described, 1 Global disclosed one fee and one expense it could take from investors in the MOIs.  The first was a management fee of 13% of merchants' MCA repayments.  Through April 2018, 1 Global's bank records show it collected $240 million in MCA repayments.  1 West, 1 Global's sister company, collected an additional $1 million.

Furthermore, the Company collected about $2.1 million from Travis Portfolio, for a total of $243.1 million in collections.  Taking 13% of that total, 1 Global could have taken a maximum of $31.6 million in management fees from those repayments through April 2018.

73.     The expense 1 Global told investors about in the MOI was the finder's fees it was paying third parties to find merchants to enter into MCAs.  1 Global paid those third parties approximately $15 million in fees through April 2018.  Thus, the maximum amount of fees and expenses 1 Global could have taken from investors through April 2018 was only $46.6 million.

74.     However, through April 2018, Ruderman and 1 Global actually used about $81.3 million in investor funds (not including the $50 million 1 Global spent on the Travis Portfolio deal).  This consisted of $53 million in operating expenses, and at least $28 million in misappropriated funds sent to Ruderman and numerous Ruderman-related entities (described below).  Thus, the statements that 1 Global would take a 13% management fee and get reimbursed for only one expense from investor funds were false.

75.     Ruderman knew 1 Global had used these excess investor funds because he personally authorized most, if not all, of the $28 million in misappropriated funds and closely monitored the Company's finances, sometimes receiving daily reports.

### C.  False Monthly Account Statements

76.     1 Global provided every investor with a monthly account statement that showed all of the individual MCAs in which an investor's money was spent – frequently numbering into the hundreds of contracts.  The monthly statements at first showed the individual merchants who received each MCA, then were changed to show only contract numbers, then changed again to show only the type of business that had received each MCA.  Ruderman ordered these changes.

77.     Early versions of the account statements added up the dollar amount in each MCA

to reflect "total net current account receivables" – i.e., how much each investor could expect to receive in repayment from the outstanding MCAs.  Below that figure, the account statement contained a total alternatively called "cash not yet deployed," "cash to be deployed," or "cash for future receivables."  Regardless of the terminology used, the figure represented the amount of the investment that 1 Global had not yet put into MCAs and was purportedly sitting in 1 Global's bank accounts available for MCA funding.

78.     The early versions of the account statement added up the two totals to represent what the investor's portfolio was then purportedly worth.  Investors could plainly see on these monthly statements how much their investment had allegedly increased in value, which directly correlated to the rate of return each investor was allegedly earning.  In addition, on the first page of each monthly statement, 1 Global expressly told investors the value of their portfolio, the increase in the valuation of their portfolio since they invested, and what rate of return their investment had earned to date.

79.     Ruderman received, reviewed, and approved the client statements before 1 Global sent them to investors.  He also received a monthly report from the Company's financial analysts showing the total amounts from all investors loaned to merchants and the total cash allegedly available from investors in 1 Global's bank accounts.  The Company's Chief Financial Officer signed the account statements, and its Director of Business Development sent them out.  However, Ruderman had to approve sending out the statements before they could be given to investors.

80.     Starting no later than October 2017, the monthly account statements were false because they misrepresented the amount of "cash not yet deployed" available in 1 Global's bank accounts on every investor's account statement.  That month, due in large part to the Ruderman-

authorized misappropriation and misuse of investor funds, the company's financial analysts discovered that the total of "cash not yet deployed" on all the account statements was approximately $23 million higher than the actual cash in 1 Global's bank accounts.

81.     As of October 31, 2017, investor account statements in the aggregate showed approximately $89 million in "cash not yet deployed." Yet 1 Global's bank accounts held only approximately $65.7 million in cash, a difference of $23.3 million. Thus, every account statement showed a false amount of "cash not yet deployed." Because that amount was false, the total value of each investor's portfolio, the increase in the valuation since they had invested, and the rate of return each account statement showed for each investor were all overstated.

82.     When financial analysts brought this cash shortfall to Ruderman's attention, he falsely claimed they did not include all the Company's bank accounts, and his only action was to order the "total net current account receivables" and "cash not yet deployed" lines removed from future account statements so investors could not easily tell how much of their investment remained in cash or how their total portfolio value was determined.

83.     Despite Ruderman's attempt to hide the cash shortfall from investors, the monthly account statements that he reviewed and approved continued to be false every month because the cash shortage continued every month. Despite knowing that the "cash not yet deployed" number was inaccurate, he continued to use overstated amounts of cash to overstate the total value of investors' portfolios, the increase in the valuation of investors' portfolios, and the investors' rates of return on all subsequent monthly account statements.

84.     The cash shortfall not only continued, but increased over time. As of November 30, 2017, the combination of all investors' account statements showed 1 Global should have had approximately $100.3 million in its bank accounts as "cash not yet deployed." Yet the bank

accounts held only approximately $75.5 million, a difference of $24.8 million. Thus the rates of return, the value of the portfolio, and the increase in valuation of the portfolio since inception for each investor on each monthly account statement were overstated.

85.     For December 2017, when according to the total of all monthly statements 1 Global should have had approximately $97.7 million in "cash not yet deployed" in its bank accounts, the Company had only approximately $72.4 million in its accounts, a difference of $25.3 million.  So again the rates of return and other financial metrics described above were false for each investor.

86.     This pattern continued through at least June 2018, when at month's end the combination of all investor account statements showed the Company should have had approximately $70 million in its bank accounts, while the accounts held only about $20 million, a difference of $50 million.  As a result, the rates of return and other financial metrics described above were false on each investor's account statement.

87.     Investors receiving these account statements often based their decision to allow their investment to automatically roll over on the profits and rates of return 1 Global represented they were making.  Investors said they would not have invested with 1 Global, and sales agents said they would not have solicited investors, if they had known 1 Global was misrepresenting the amount of investor cash it had on hand and the rates of return investors were earning.

### D.  False Claims About Daszkal Bolton's Work

88.     Each investor's monthly account statement falsely claimed that "Our independent audit firm, **Daszkal Bolton L.L.P.**, has endorsed and agrees with the rate of return formula." Emphasis in original.  However, Daszkal Bolton never audited 1 Global's financial statements, and never endorsed or agreed with 1 Global's rate of return formula.

89.     While 1 Global did hire Daszkal Bolton, the firm's work was limited to drafting a set of agreed-upon procedures for evaluating investors' accounts.  Furthermore, the audit firm stopped doing work for 1 Global after 2016.  Thus, every account statement containing the representation about Daszkal Bolton was false.  Investors said they would not have invested in 1 Global, and sales agents said they would not have solicited investors, if they had known 1 Global was misrepresenting the work Daszkal Bolton performed for 1 Global.

90.     In addition to misrepresenting Daszkal Bolton's status on the monthly account statements, numerous versions of 1 Global's Frequently Asked Questions provided to sales agents and in some cases to investors stated that "An external accounting firm validates [investor] loan balances quarterly."

91.     This statement was also false because neither Daszkal Bolton nor any other external accounting firm ever validated the amounts listed on investor account statements or any other document showing the amounts in an investor portfolio.

92.     Investors said they would not have invested in 1 Global, and sales agents said they would not have solicited investors, if they had known 1 Global was falsely representing the work Daszkal Bolton performed for the Company.

### E.  Misappropriation Of Investor Funds

93.     Beginning no later than 2016, Ruderman regularly instructed 1 Global accountants and other employees to transfer investor funds to benefit himself, his family, and other close acquaintances, either directly or through entities they owned.  When one accountant repeatedly questioned these transfers as improper, Ruderman told the accountant 1 Global was his company and he could do what he wanted with its money.

94.     As of June 30, 2018, 1 Global at Ruderman's direction had transferred about

$15.3 million to Bright Smile Financing, a company that loaned individuals money for cosmetic dental procedures.   There was no agreement between 1 Global investors and Bright Smile Financing for 1 Global to provide that funding, and 1 Global investors do not have a documented ownership interest in Bright Smile Financing.  Bright Smile Financing provided no consideration or services in exchange for the money.  Corporate records show Bright Smile Financing is 100% owned by Ruderman through the Bright Smile Trust.

95.    Also as of June 30, 2018, 1 Global had sent approximately $5.6 million to Ganador, a consumer/payday loan service, at Ruderman's direction.  1 Global investors do not have a documented ownership interest in Ganador, but the Ruderman Family Trust owns 50% of the firm.  Ganador provided no consideration or services for the $5.6 million.

96.    Ruderman authorized or ordered 1 Global to send investor funds to family members as well.  For example, on January 10, 2018, one of Ruderman's sons incorporated BRR Block.  Six days later, 1 Global funded BRR Block with $1 million of investor funds for no consideration or services.

97.    Ruderman also had more than $4 million of 1 Global investor money sent to the Ruderman Family Trust, of which his wife and children are beneficiaries.  Ruderman had the Company pay the Trust approximately $81,283 a month (slightly less than $1 million a year) in investor funds, purportedly to compensate Ruderman for his interest in entities that had almost nothing to do with 1 Global's business.  The last of these payments occurred on July 26, 2018, one day before 1 Global filed for bankruptcy.  The Trust provided no services or consideration for the money.

98.    1 Global paid Ruderman's current wife a $116,000 annual salary, although she had no listed job with the Company and no office or desk there.  1 Global employees never saw

her do any work for the Company.  In addition, Ruderman received a $240,000 annual salary.

99.      Ruderman's pilfering of investor funds did not stop there.  He used significant amounts to fund a lavish lifestyle that included:

- Monthly lease payments for a Mercedes Benz;

- Payment for a luxury family vacation to Greece;

- Payments to a housekeeper and a chef;

- Monthly payments on a personal American Express credit card and a Bank of America credit card;

- Payment for his son's auto insurance;

- Payment to a company where his wife's sister was listed as the manager; and

- Payments to his ex-wife.

100.    None of these payments to Ruderman and related entities were disclosed to investors, and the fleecing of investor funds by Ruderman from 1 Global directly inhibited 1 Global's ability to make MCA loans and placed investor funds at risk.

### VII.  CLAIMS FOR RELIEF

### COUNT I

### Violations Of Sections 5(a) And 5(c) Of The Securities Act

101.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

102.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by 1 Global as described in this Complaint, and no exemption from registration existed with respect to those securities.

103.    From no later than February 2014 through July 27, 2018, 1 Global and Ruderman,

directly and indirectly:

    (a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

    (b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

    (c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use of medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

104.    By reason of the foregoing 1 Global and Ruderman violated, and unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Violations Of Section 17(a)(1) Of The Securities Act

105.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

106.    From no later than February 2014 through July 27, 2018, 1 Global and Ruderman, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes or artifices to defraud.

107.    By reason of the foregoing, 1 Global and Ruderman violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Violations Of Section 17(a)(2) Of The Securities Act

108.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

109.    From no later than February 2014 through July 27, 2018, 1 Global and Ruderman, in the offer or sale of securities by any use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

110.    By reason of the foregoing, 1 Global and Ruderman violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT IV

### Violations Of Section 17(a)(3) Of The Securities Act

111.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

112.    From no later than February 2014 through July 27, 2018, 1 Global and Ruderman, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

113.    By reason of the foregoing, 1 Global and Ruderman violated, and, unless

enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### Violations Of Section 10(b) And Rule 10b-5(a) Of The Exchange Act

114.     The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

115.     From no later than February 2014 through July 27, 2018, 1 Global and Ruderman, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes, or artifices to defraud in connection with the purchase or sale of securities.

116.     By reason of the foregoing, 1 Global and Ruderman violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT VI

### Violations Of Section 10(b) And Rule 10b-5(b) Of The Exchange Act

117.     The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

118.     From no later than February 2014 through July 27, 2018, 1 Global and Ruderman, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

119.     By reason of the foregoing, 1 Global violated, and, unless enjoined, is reasonably

likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.SC. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT VII

### Violations Of Section 10(b) And Rule 10b-5(c) Of The Exchange Act

124.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

125.    1 Global and Ruderman, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, engaged in acts, practices, and courses of business which have operated, or are now operating and will operate, as a fraud upon the purchasers of securities.

126.    By reason of the foregoing, 1 Global and Ruderman violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(c), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT VIII

### Aiding And Abetting 1 Global's Violations Of Section 10(b) And Rule 10b-5 Of The Exchange Act

### (Against Ruderman)

120.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

121.    From no later than February 2014 through July 27, 2018, 1 Global, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, employed devices, schemes, or artifices to defraud in connection with the purchase or sale of securities; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were

made, not misleading; or engaged in acts, practices, and courses of business which have operated, or are now operating and will operate, as a fraud upon the purchasers of securities, in violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

122.    Ruderman knowingly or recklessly substantially assisted 1 Global's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act.

123.    By reason of the foregoing, Ruderman, directly or indirectly, violated, and, unless enjoined, is reasonably likely to continue to aid and abet violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

### COUNT IX

### Section 20(a) Of The Exchange Act – Control Person Liability

### (Against Ruderman)

127.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

128.    From no later than February 2014 through July 27, 2018, Ruderman was, directly or indirectly, a control person of 1 Global for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

129.    During that time, 1 Global violated Section 10(b) and Rule 10b-5 of the Exchange Act.

130.    As a control person of 1 Global, Ruderman is jointly and severally liable with and to the same extent as 1 Global for its violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

131.    By reason of the foregoing, Ruderman, directly and indirectly, violated, and,

31

unless enjoined, is reasonably likely to continue to violate, Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and 17 C.F.R. § 240.10b-5.

## COUNT X

### Violations Of Section 15(a) Of The Exchange Act

132.    The Commission repeats and realleges Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

133.    From no later than February 2014 through July 27, 2018, the Defendants, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associating with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

134.    By reason of the foregoing, the Defendants, directly or indirectly, violated, and, unless enjoined, are reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

### VIII.  REMEDIES REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find the Defendants committed the violations alleged, and:

### A.  Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining: (1) 1 Global and Ruderman from violating Sections 5(a) and 5(c) and 17(a) of the Securities Act, and Sections 10(b) and 15(a)(1) and Rule 10b-5 of the Exchange Act; (2) Ruderman from aiding and abetting 1 Global's violations of Section 10(b) and Rule 10b-5 of the Exchange Act; and (3) Ruderman from

32

violating Sections 10(b) and 20(a) and Rule 10b-5 of the Exchange Act.

## B.  Disgorgement

Issue an Order directing 1 Global, Ruderman, and all of the Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## C.  Civil Penalties

Issue an Order directing 1 Global and Ruderman to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

## D.  Asset Freeze

Issue an Order freezing the assets of Ruderman and Relief Defendants Bright Smile Financing, BRR Block, Digi South, Ganador Enterprises, Media Pay, Pay Now Direct, and the Ruderman Family Trust until further Order of this Court.

## E.  Sworn Accounting

Issue an Order directing Ruderman and Relief Defendants Bright Smile Financing, BRR Block, Digi South, Ganador Enterprises, Media Pay, Pay Now Direct, and the Ruderman Family Trust to provide a sworn accounting of all proceeds received resulting from the acts or courses of conduct alleged in this Complaint.

## F.  Appointment Of A Receiver

Appoint a Receiver over Relief Defendants Bright Smile Financing, Ganador Enterprises, BRR Block, Digi South, Media Pay, and Pay Now Direct.

## G.  Records Preservation

Issue an Order restraining and enjoining Ruderman and Relief Defendants Bright Smile Financing, BRR Block, Digi South, Ganador Enterprises, Media Pay, Pay Now Direct, and the

Ruderman Family Trust from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files, and other property of or pertaining to all Defendants and Relief Defendants, wherever located and in whatever form, electronic or otherwise, that refer, reflect, or relate to the acts of courses of conduct alleged in this Complaint, until further Order of the Court.

Respectfully submitted,

August 23, 2018                              By

Christopher E. Martin, Esq.
Senior Trial Counsel
SD Fla. Bar No. A5500747
Direct Dial: (305) 982-6386
Email: martinc@sec.gov

Robert K. Levenson, Esq.
Senior Trial Counsel
Florida Bar No. 0089771
Direct Dial:  (305) 982-6341
Email:  levensonr@sec.gov

Case 0:18-cv-61991-BB *SEALED* Document 1-1 Entered on FLSD Docket 08/23/2018 Page 1 of 1

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS Securities and Exchange Commission

FILED BY ___ DC

AUG 23 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD

**DEFENDANTS** 1 Global Capital LLC et al.

(b) County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Broward County
*(IN U.S. PLAINTIFF CASES ONLY)*
IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Robert Levenson and Christopher Martin, SEC, 801 Brickell Avenue,
Suite 1800, Miami, FL 33131; Tel. (305) 982-6341; (305) 982-6386

Attorneys *(If Known)*

(d) Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☑ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
**Other:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729 (a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☑ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed *(See VI below)*
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)
*(See instructions):* a) Re-filed Case ☐ YES ☑ NO  b) Related Cases ☐ YES ☑ NO
DOCKET NUMBER:

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*
15 U.S.C. §§ 77q(a)(1)-(3),77e(a),77e(c),78o(a)(1), 78t(a); 17 C.F.R. §§ 240.10b-5 and 10b-5(a)-(c); violation of federal securities laws
LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ asset freeze, civil penalty; permanent injunction etc.
CHECK YES only if demanded in complaint:
disgorgement and prejudgment interest,
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE 8-22-18
SIGNATURE OF ATTORNEY OF RECORD
/s/Robert K. Levenson and Christopher Martin

**FOR OFFICE USE ONLY**
RECEIPT # ___  AMOUNT ___  IFP ___  JUDGE ___  MAG JUDGE ___